1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DEBRA LYNN DOUGHERTY,

11            Plaintiff,                    No. CIV S-10-1634 EFB

12        vs.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,

14
             Defendant.                     ORDER

15   _____/

16        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

17   ("Commissioner") denying her application for Social Security Disability Insurance Benefits

18   ("DIB") under Title II of the Social Security Act.  The parties' cross-motions for summary

19   judgment motions are pending.  For the reasons discussed below, the court grants the

20   Commissioner's motion and denies plaintiff's motion.

21   I.      BACKGROUND

22        Plaintiff, born February 15, 1963, formally applied for DIB on July 2, 2007, alleging that

23   she had been disabled since November 23, 2004.  Administrative Record ("AR") 20, 23.

24   Plaintiff's application was denied initially and upon reconsideration, and plaintiff requested an

25   administrative hearing.  *Id.*  On December 11, 2008, and July 1, 2009, hearings were held before

26   administrative law judge ("ALJ") Laura Speck Havens.  *Id.* at 20.  Plaintiff was represented by

                                          1

1   counsel at the hearings, at which she and a vocational expert ("VE") testified.  *Id.*

2           The ALJ's November 3, 2009 decision found that plaintiff was not disabled from the

3   disability onset date until the date of the decision.[1]  *Id.* at 20-29.  The ALJ made the following

4   specific findings:

5           1.  The claimant meets the insured status requirements of the Social Security Act
            through December 31, 2009.

6

7           2.  The claimant has not engaged in substantial gainful activity since November
            23, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*).

8           3.  The claimant has the following severe impairments: myofascial pain syndrome
            and left hip osteoarthritis (20 CFR 404.1520(c)).

9
                                                    ***
10
            4.  The claimant does not have an impairment or combination of impairments that
11          meets or medically equals one of the listed impairments in 20 CFR Part 404,
            Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

12
                                                    ***
13

14          [1] Disability Insurance Benefits are paid to disabled persons who have contributed to the
     Social Security program, 42 U.S.C. §§ 401 *et seq.*  Supplemental Security Income is paid to
15   disabled persons with low income.  42 U.S.C. §§ 1382 *et seq.*  Both provisions define disability,
     in part, as an "inability to engage in any substantial gainful activity" due to "a medically
16   determinable physical or mental impairment. . . ."  42 U.S.C. § 1382c(a)(3)(A).  A five-step
     sequential evaluation governs eligibility for benefits under both programs.  *See* 20 C.F.R.
17   §§ 404.1520, 404.1571-76,  416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42
     (1987).  The following summarizes the sequential evaluation:
18                   Step one:  Is the claimant engaging in substantial gainful activity?  If so,
             the claimant is found not disabled.  If not, proceed to step two.
19                   Step two:  Does the claimant have a "severe" impairment?  If so, proceed
             to step three.  If not, then a finding of not disabled is appropriate.
20                   Step three:  Does the claimant's impairment or combination of
             impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P,
21           App.1?  If so, the claimant is automatically determined disabled.  If not, proceed
             to step four.
22                   Step four:  Is the claimant capable of performing his past work?  If so, the
             claimant is not disabled.  If not, proceed to step five.
23                   Step five:  Does the claimant have the residual functional capacity to
             perform any other work?  If so, the claimant is not disabled.  If not, the claimant
24           is disabled.
     *Lester v. Chater,* 81 F.3d 821, 828, n.5 (9th Cir. 1995).
25           The claimant bears the burden of proof in the first four steps of the sequential evaluation
     process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
26   evaluation process proceeds to step five.  *Id.*

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of medium work as defined in 20 CFR 404.1567(c). She is able to sit, stand, or walk 6 hours each during a normal 8-hour workday, and is able to lift or carry 50 pounds occasionally, 25 pounds frequently. She can occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant is limited to occasional reaching and performing tasks involving fine and gross manipulation with her right dominant upper extremity.

\*\*\*

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

\*\*\*

7. The claimant was born on February 15, 1963 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can performed (20 CFR 404.1569 and 404.1569(a)).

\*\*\*

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 23, 2004 through the date of this decision.

*Id.* at 20-29.

Plaintiff requested that the Appeals Council review the ALJ's decision. The Appeals Council denied review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security. *Id.* at 1-3.

II. LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were

1    applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000);

2    *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*,

3    180 F.3d 1094, 1097 (9th Cir. 1999).

4         The findings of the Commissioner as to any fact, if supported by substantial evidence,

5    are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

6    more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521

7    (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to

8    support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol.*

9    *Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

10        "The ALJ is responsible for determining credibility, resolving conflicts in medical

11   testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

12   2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

13   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

14   *Thomas v. Barnhart*, 278  F.3d 947, 954 (9th Cir. 2002).

15   III.  ANALYSIS

16        Plaintiff argues that the ALJ erred in 1) finding that her mental impairments were not

17   severe at step two; 2) failing to articulate specific and legitimate reasons for discrediting

18   plaintiff's treating physician, Dr. Mehtani's, opinion; 3) finding that she did not meet or equal a

19   listing at step three; and 4) failing to consider plaintiff's mental impairments in assessing her

20   RFC.

21        A.      The ALJ's Error in Finding Plaintiff's Impairments Non-Severe Was Harmless.

22        As noted above, the ALJ found at step two that plaintiff had no severe mental

23   impairments.  She wrote:

24        The claimant has been diagnosed with mood and cognitive disorder.  The medical
          evidence shows that these impairments are longstanding for the past 10 years or
25        more, but that the claimant was able to work full time at a semi-skilled job for
          several years prior to when she stopped working on the alleged onset of disability
26        date [Exhibit 21F, 14F].  This shows that although the impairments may have

                                      4

1    been present, they did not individually or in combination with other impairments
     prevent the claimant from working.
2  AR at 22.

3         A severe impairment is one that "significantly limits" a claimant's "physical or mental

4  ability to do basic work activities." 20 C.F.R. § 404.1520(c). An ALJ must consider all of the

5  evidence at step two to determine whether a medically determinable impairment significantly

6  limits the claimant's ability to perform basic work activities. *Id.* § 404.1520(a); *Bowen v.*

7  *Yuckert*, 482 U.S. 137, 145 (1987). "An impairment or combination of impairments may be

8  found 'not severe only if the evidence establishes a slight abnormality that has no more than a

9  minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686–87

10  (9th Cir. 2005) (citation omitted). Step two is "a de minimis screening device [used] to dispose

11  of groundless claims" and the ALJ's finding must be "clearly established by medical evidence."

12  *Id.* at 687 (citations and quotation marks omitted).

13         A summary of some of the evidence of plaintiff's mental impairments follows. In 1985,

14  nearly two decades before plaintiff's claimed disability onset date, she sustained a head injury in

15  an accident, and was comatose for six weeks afterwards. AR 417. In 1988, a doctor wrote a

16  report opining that plaintiff had mental impairments in the area of language function ("These

17  problems may cause Debbie to have difficulty expressing herself quickly sometimes, though

18  given extra time, she can most likely express herself adequately"); drawing a complex figure;

19  and new learning of verbal information ("These problems do not mean that Debbie cannot learn.

20  They do mean that she will often learn more slowly than she used to and may need special

21  assistance and/ or more time to acquire new information and skills"). *Id.* at 418-19. In addition,

22  the report noted that plaintiff had the problem of "emotional upset and variability . . . her head

23  injury . . . had probably contributed to her problems with emotional control." *Id.* at 419.

24         In 2003, Dr. Jaggy, who was evaluating plaintiff for shoulder pain, wrote that she

25  "appears very anxious and cries most of the time during the office visit . . . [s]he seems very

26  distressed and can hardly contain herself." *Id.* at 421. His impression was that plaintiff had

5

1    "Anxiety/ depression, reactive to work circumstances."  *Id.*  He also referred her to counseling

2    for PTSD.  *Id.* at 422.

3         Also in 2003, Dr. Nijar, who was examining plaintiff for a worker's compensation claim,

4    wrote that plaintiff was "a very poor historian.  She had a craniotomy performed in her younger

5    days, and cannot keep her facts together for any significant period of time.  More than two hours

6    were required to take the history for this patient."  *Id.* at 424.

7         In 2007 and 2008, plaintiff saw a social worker at Calaveras Mental Health Department

8    on a number of occasions.  *See id.* at 354-72.  The records of her visits discuss plaintiff's anger,

9    agitation, anxiety, and stress.  She was given Axis 1 diagnoses of generalized anxiety and PTSD.

10   *Id.* at 366.

11        In early 2008, Dr. Mehtani, a psychiatrist at Fair Oaks Psychiatric, wrote a letter to

12   plaintiff's attorney explaining that he had diagnosed plaintiff with major depressive disorder and

13   post traumatic stress disorder, chronic headaches, traumatic brain injury, and severe pyschosocial

14   stressors, with a global assessment functioning score of 40.  *Id.* at 413-14.  He wrote, "[plaintiff]

15   is clinically depressed.  She is in need of ongoing psychiatric care and treatment.  She is severely

16   impaired in her daily functioning and activities.  She is not able to cope with any stress.  She is

17   likely to decompensate in a work like situation.  She is barely able to take care of her personal

18   hygiene.  She is not able to understand or comprehend simple instructions."  *Id.* at 414.  Mehtani

19   noted that plaintiff had been seeing a counselor "on and off for a long time" and that she was

20   currently seeing a therapist named Cindy Lopez.  *Id.* at 412.  Mehtani filled out a "Medical

21   Source Statement of Ability to Do Work-Related Activities (Mental)," in which he opined that

22   plaintiff had marked impairments in understanding and remembering simple instructions,

23   carrying out simple instructions, making judgments on simple work-related decisions, carrying

24   out complex instructions, and her ability to make judgments on complex work-related decisions,

25   as well as her ability to interact appropriately with the public, supervisors, and co-workers, and

26   respond appropriately to usual work situations and to changes in a routine work setting; and

6

1  moderate impairments in understanding and carrying out complex instructions.  *Id.* at 468-69.  At

2  her December 11, 2008 hearing, plaintiff testified that she saw Dr. Mehtani once every six

3  weeks, and that she took the medication Cymbalta.  *Id.* at 60.

4        On January 9, 2009, at the request of the ALJ, a state psychiatrist, Dr. Wong, examined

5  plaintiff.  *Id.* at 450-53.  He diagnosed her with a cognitive disorder and a mood disorder, but

6  opined that the cognitive disorder was "probably longstanding, preexsisting, and stable and

7  stationary for the last 10 years or so" and that her mood disorder was in remission.  *Id.* at 452.

8  He wrote that plaintiff "has never been seen by a psychiatrist for treatment or a psychotherapist

9  for counseling."  *Id.* at 450.  Strangely, in the next paragraph, Wong acknowledged that plaintiff

10  had been seeing Dr. Mehtani "for possibly the last 6 to 12 months . . . for checkups every three to

11  six weeks" and was taking two psychiatric medications.  *Id.*  Wong noted that he did not have

12  Mehtani's records.  *Id.*  On examination, Wong noted that plaintiff had "little psychological

13  insight into conflict management with others"; that her attention and concentration were "fairly

14  good" and "intact" but that her performance on tests suggested "organic neuropsychiatric

15  change"; and that her memory registration was poor.  *Id.* at 452.

16        As noted above, the ALJ commented at step two that plaintiff had been "diagnosed with

17  mood and cognitive disorder," but found that she suffered from these disorders for years while

18  she worked full time, and that therefore the impairments "did not individually or in combination

19  with other impairments prevent the claimant from working."  *Id.* at 22.  While this states a

20  conclusion to the ultimate question that must be answered under the sequential evaluation, it is

21  not the proper legal standard at this step of the evaluation, which is merely a screening inquiry to

22  eliminate claims based on de minimis impairments.  *Webb v. Barnhart*, 433 F.3d at 686–87.  The

23  correct inquiry at step two is whether plaintiff's mental impairments *significantly limit* her ability

24  to do basic work activities, not whether they completely prevented her from working at all.  *See*

25  20 C.F.R. § 404.1520(c).  In addition, the ALJ only considered whether plaintiff's mental

26  impairments, in combination with her other impairments, *had* prevented her from working in the

1    past.  Even if plaintiff's mental impairments, in combination with her other impairments, did not

2    prevent her from working in the past, and her mental impairments remained at the same level of

3    severity, her other impairments may have worsened so that the combination would now prevent

4    her from working.

5         Thus, the ALJ misapplied the legal standard in finding that plaintiff's mental impairments

6    were non-severe at step two.  However, this error is harmless if the ALJ accounted for all of

7    plaintiff's limitations in assessing plaintiff's RFC.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th

8    Cir. 2007) (holding that when an ALJ accounts for resulting limitations later in the sequential

9    evaluation process, any error in finding the impairment non-severe at Step Two is harmless).

10   The question is whether the ALJ properly considered the functional limitations of all medically

11   determinable impairments at the remaining steps.  *See Smolen*, 80 F.3d at 1290 (if one severe

12   impairment exists, all medically determinable impairments must be considered in the remaining

13   steps of the sequential analysis) (citing 20 C.F.R. § 404.1523); *see Burch v. Barnhart*, 400 F.3d

14   676, 682-82 (9th Cir. 2005) (ALJ's failure to find claimant's obesity severe at step two was

15   harmless error where it was considered in determining claimant's RFC).

16        Here, any error in not listing plaintiff's mental impairments as "severe" at step two is

17   harmless, as the ALJ considered the mental impairments at step four.  In her step four analysis,

18   the ALJ wrote:

19       Turning to the claimant's alleged mental impairments, the medical evidence
         shows that the claimant may have some cognitive limitations and depression or
20       anger control issues, but is not convincing that the extent of the alleged
         impairments preclude the claimant from working.  As discussed above, she has
21       been diagnosed with a long-standing cognitive disorder originating many years
         before she stopped working in 2004.  Despite this possible impairment, she
22       worked at a semi-skilled job for several years and no medical evidence suggested
         that she stopped working because of any mental impairment.

23

24   AR at 26.  The ALJ went on to discuss plaintiff's December 2007 examination and diagnosis of

25   anger, agitation, and anxiety; Dr. Mehtani's records and opinion; a state agency consultant's

26   opinion and completed Psychiatric Review Technique form; and a psychiatric consultative

1  examiner's opinion. *See id.* at 26-28.  Thus, the ALJ weighed evidence of plaintiff's mental

2  impairments in assessing her residual functional capacity.  Plaintiff may not agree with the

3  ALJ's interpretation of the medical evidence, but this is a separate concern.

4          B.          The ALJ Did Not Err in Rejecting Plaintiff's Treating Psychiatrist's Opinion.

5          Plaintiff argues that the ALJ erred in rejecting Dr. Mehtani's opinion.  Dr. Mehtani was

6  plaintiff's treating psychiatrist; plaintiff testified that she saw him once every six weeks.[2]  AR

7  60.  Mehtani completed a medical source statement in which he opined that plaintiff was

8  markedly impaired in her ability to understand, remember and carry out simple instructions;

9  make judgments on simple and complex work-related decisions; interact appropriately with the

10  public, supervisors, and co-workers, and respond appropriately to usual work situations and

11  changes in a routine work setting; and moderately impaired in her ability to understand and

12  remember complex instructions.  *Id.* at 468.  Mehtani wrote a letter to plaintiff's attorney

13  diagnosing plaintiff with major depressive disorder, post-traumatic stress disorder, chronic

14  recurrent headaches, traumatic brain injury, and severe psychosocial stressors.  *Id.* at 471-72.

15  Mehtani opined that plaintiff was "severely impaired in her daily functioning and activities.  She

16  is not able to cope with any stress.  She is likely to decompensate in a work like situation.  She is

17  barely able to take care of her personal hygiene.  She is not able to understand or comprehend

18  simple instructions."  *Id.* at 473.

19          The ALJ gave Mehtani's opinions little weight.  She gave a number of reasons for

20  discounting Mehtani's opinions, including: 1) plaintiff denied to Mehtani that she was using

21  drugs, even though other records showed that she was smoking up to three marijuana cigarettes a

22  day; 2) Mehtani's opinion merely endorsed plaintiff's subjective reporting of symptoms; 3)

23  Mehtani's opinion did not refer to corroborating medical evidence; 4) nothing in the medical

24  record supported Mehtani's conclusion that plaintiff could not take care of her personal hygiene

25

26          [2] Plaintiff claims that she saw Mehtani for "about a year" but does not provide a citation
to section of the transcript that corroborates this assertion.  *See* dckt. No. 15-1 at 7.

9

1 or understand and comprehend simple instructions; 5) Mehtani's opinion was contrary to that of

2 a state agency consultant who reviewed all of the existing medical evidence; 6) Mehtani's

3 opinion was contrary to that of a psychiatric consultative examiner; and 7) Mehtani appeared to

4 be functioning as an advocate for plaintiff in her worker's compensation and disability claim. *Id.*

5 at 26-28.

6      The weight given to medical opinions depends in part on whether they are proffered by

7 treating, examining, or non-examining professionals. *Lester v. Chater*, 81 F.3d 821, 834 (9th

8 Cir. 1996).  Ordinarily, more weight is given to the opinion of a treating professional, who has a

9 greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80

10 F.3d 1273, 1295 (9th Cir. 1996).  To evaluate whether an ALJ properly rejected a medical

11 opinion, in addition to considering its source, the court considers whether (1) contradictory

12 opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an

13 uncontradicted opinion of a treating or examining medical professional only for "clear and

14 convincing" reasons. *Lester*, 81 F.3d at 831.  In contrast, a contradicted opinion of a treating or

15 examining professional may be rejected for "specific and legitimate" reasons, that are supported

16 by substantial evidence. *Id*., at 830.  While a treating professional's opinion generally is

17 accorded superior weight, if it is contradicted by a supported examining professional's opinion

18 (e.g., supported by different independent clinical findings), the ALJ may resolve the conflict.

19 *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (*citing Magallanes v. Bowen*, 881 F.2d

20 747, 751 (9th Cir. 1989)).  However, "[w]hen an examining physician relies on the same clinical

21 findings as a treating physician, but differs only in his or her conclusions, the conclusions of the

22 examining physician are not 'substantial evidence.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir.

23 2007).

24      Here, Mehtani was plaintiff's treating physican, but his opinions were contradicted by the

25 consultative physicians.  Thus, the ALJ was required to give "specific and legitimate" opinions

26 for rejecting his opinion.

1    Plaintiff does not argue that each of the reasons the ALJ gave for rejecting Mehtani's

2    opinions were not specific and legitimate.  Instead, plaintiff argues that the ALJ ought to have

3    credited Mehtani's opinion over the opinion of Dr. Wong, a psychiatric consultative examiner,

4    because Wong did not review the records relating to plaintiff's 1985 car accident and head

5    injury.  But the ALJ did not reject Mehtani's opinion solely on the basis that it conflicted with

6    Wong's opinion.  Rather, as explained above, the ALJ gave a number of reasons for rejecting

7    Mehtani's opinion; its inconsistency with Wong's opinion was only one factor in the ALJ's

8    decision to give it little weight.  Although plaintiff disagrees with the ALJ's interpretation of the

9    evidence, the ALJ is responsible for resolving conflicts in medical testimony.  *See Edlund*, 253

10   F.3d at 1156.  The ALJ did not commit reversible error in rejecting Dr. Mehtani's opinion.

11          C.      The ALJ's Finding that Plaintiff Did Not Meet or Equal a Listing is Supported
                    by Substantial Evidence.

12

13   Plaintiff argues that the ALJ erred in failing to find her disabled at step three because she

14   meets Listing 12.02, Organic Mental Disorders.  Dckt. No. 15-1 at 11.  As noted above, the ALJ

15   found that plaintiff's mental impairments were non-severe at step two.  At step three, the ALJ

16   found that plaintiff did not have an impairment or combination of impairments that met or

17   equaled a listed impairment.  *See* AR 22 ("There are no medical findings or suggestions in the

18   medical record that the claimant's conditions meets the requirements or equals the level of

19   severity for any listed impairment.").

20          Listing 12.02 ("Organic Mental Disorders") contains severity criteria for:

21          Psychological or behavioral abnormalities associated with a dysfunction of the
            brain. History and physical examination or laboratory tests demonstrate the

22          presence of a specific organic factor judged to be etiologically related to the
            abnormal mental state and loss of previously acquired functional abilities.

23

24   20 CFR Pt. 404, Subpart P, App. 1.  A claimant meets the required level of severity for this

25   listing when at least one of the requirements listed in A are satisfied and at least two of the

26   requirements in B are satisfied.  *Id.*  The requirements are:

11

1    A. Demonstration of a loss of specific cognitive abilities or affective changes and
     the medically documented persistence of at least one of the following:

2    1. Disorientation to time and place; or
     2. Memory impairment, either short-term (inability to learn new information),

3    intermediate, or long-term (inability to remember information that was known
     sometime in the past); or

4    3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
     4. Change in personality; or

5    5. Disturbance in mood; or
     6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and

6    impairment in impulse control; or
     7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid

7    levels or overall impairment index clearly within the severely impaired range on
     neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.;

8    ...

9    B. Resulting in at least two of the following:
     1. Marked restriction of activities of daily living; or

10   2. Marked difficulties in maintaining social functioning; or
     3. Marked difficulties in maintaining concentration, persistence, or pace; or

11   4. Repeated episodes of decompensation, each of extended duration[.]

12   *Id.*

13   Plaintiff argues that the record shows that she meets more than one of the "A" criteria.

14   She was in a car accident in 1985, and was comatose for six weeks after the injury.  AR 417.

15   The record contains a neurological evaluation report from 1988.  AR 417-19.  The report opines

16   that "new learning of verbal information" was the most severely impaired area of functioning,

17   but that she had problems with retention as well.  *Id.* at 418.  Also, the report states "An

18   additional problem for Debbie at the present time is emotional upset and variability.  Since her

19   head injury involved damage to the frontal lobes, it has probably contributed to her problems

20   with emotional control."  *Id.* at 419.  Plaintiff argues that this report, coupled with Dr. Mehtani's

21   opinions and the observations of the psychological consultative examiner, shows that she meets

22   more than one of the "A" criteria above.  As for the "B" criteria, plaintiff argues that Mehtani's

23   opinion and her own testimony show that she has marked restriction in daily living and

24   maintaining social functioning.

25   Plaintiff argues that the ALJ erred in failing to consider the medical records relating to

26   her 1985 car accident and brain injury.  *See* Dckt. No. 15-1 at 10.  At the hearing the ALJ stated

12

1   that she did not consider the records to be relevant, as they were more than 20 years old, and

2   plaintiff had worked at a full-time job for years during that time.  AR 48-50.  The ALJ stated that

3   she would not look at records from before the year 2000.  *Id.* at 51.  Plaintiff contends that by

4   refusing to consider the old medical records, the ALJ abused her discretion.  Plaintiff does not

5   cite any authority supporting this proposition, but argues that by rejecting the old records, the

6   ALJ "substituted her judgment of expert witnesses for [her] own."  Dckt. No. 15-1 at 10.

7          In her application, plaintiff alleges a disability onset date of 2004.  The ALJ's task was to

8   determine whether the medical evidence showed that plaintiff's mental impairments, either alone

9   or in combination with her physical impairments, prevented her from working after the onset

10  date.  Although medical records from the 1980s are arguably relevant to this application for

11  benefits, as they might inform the interpretation of more recent medical records, records that are

12  more than two decades old only document plaintiff's health at that time.  They cannot, on their

13  own, prove that plaintiff meets or equals a listing for the purpose of this proceeding, because the

14  state of plaintiff's health has likely changed since the 1980s.  The ALJ determined that more

15  recent medical evidence showed that plaintiff was not precluded from working.  *See* AR 23-27

16  (discussing the medical evidence and determining plaintiff's RFC).

17         Plaintiff argues that under *Fanning v. Bowen*, 827 F.2d 631, 634 (9th Cir. 1987), if

18  plaintiff's records from the 1980s show that she met or equaled a listing at that time, she should

19  be found to be disabled in this proceeding even though she held a full-time job for much of the

20  previous two decades.  In *Fanning*, the court held that where a plaintiff met a listing for the 12-

21  month durational requirement, he must be found disabled without consideration of his work

22  experience.  But the facts of *Fanning* did not include the relevance of decades-old medical

23  evidence.  As noted above, even if plaintiff met or equaled a listing in the 1980s, plaintiff's

24  health may have improved over time; the ALJ was not required to find plaintiff disabled on the

25  basis of records from the 1980s.

26  ////

1       Plaintiff also briefly argues that "The ALJ also had a duty to develop the record."  Dckt.

2  No. 15-1 at 10 (citing *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) ("When a claimant

3  appears at a hearing without counsel, the ALJ must 'scrupulously and conscientiously probe into,

4  inquire of, and explore for all the relevant facts. He must be especially diligent in ensuring that

5  favorable as well as unfavorable facts and circumstances are elicited'") (citations omitted)).  But

6  plaintiff was represented by counsel at the hearing; she does not explain how the ALJ's actions

7  are in conflict with the rule pronounced in *Key*.

8       Thus, the ALJ did not err in finding that plaintiff did not meet or equal a listing at step

9  three.

10       D.     The ALJ Was Not Required to Include Mental Impairments in Plaintiff's RFC.

11       Finally, plaintiff argues that the ALJ ought to have included a limitation for plaintiff's

12  mental impairments in assessing plaintiff's RFC.  *See* Dckt. No. 15-1 at 18.  This argument is

13  primarily based on the ALJ's rejection of Dr. Mehtani's opinion, which, as explained above, did

14  not constitute a legal error.  The ALJ did not err in not including Mehtani's opinions in

15  plaintiff's RFC.

16  IV.  CONCLUSION

17       The court finds that, apart from harmless error, the ALJ's decision is supported by

18  substantial evidence and is based on the proper legal standards.  Therefore, IT IS ORDERED

19  that:

20       1.  Plaintiff's motion for summary judgment is denied;

21       2.  The Commissioner's cross-motion for summary judgment is granted; and

22       3. The Clerk is directed to enter judgment in the Commissioner's favor and close the

23  case.

24  DATED:  September 21, 2011.

25                    EDMUND F. BRENNAN
                        UNITED STATES MAGISTRATE JUDGE

26